IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Cr. No. 05-86T |
| | ) | |
| JOSEPH MEDEIROS | ) | |

GOVERNMENT'S MEMORANDUM OF LAW

On October 13, 2005, the defendant appeared before this Court for the purpose of entering a guilty plea to a four-count Information. At the conclusion of the government's factual proffer, the Court inquired of the defendant whether he admits the facts set forth by the government. Defendant stated that he cannot admit those facts because he has little to no recollection of the events of May 14, 2004, due to the fact that he was under the influence of drugs and alcohol on the date of the offense. Defendant did not dispute the facts as set forth by the government. As a result, the Court continued the plea hearing to November 7, 2005.

The government believes that, as to Counts I and II of the Information, defendant should be allowed to enter a nolo plea pursuant to Fed. R. Crim. P. 11(b). However, with respect to Counts III and IV of the Information, defendant should only be allowed to enter a guilty plea.

II. Statement of Facts

On or about May 18, 2004, Joseph Medeiros robbed two bars in East Providence: the East Providence Yacht Club (EPYC) and Mulhearns pub. The defendant was a well-known customer in both places. From about 5:30-6:30 p.m. on May 18, 2004, the defendant was at the EPYC.

He was not served alcohol there. When the bartender, Helena O'Neill, came on duty, she asked him to leave because he was not allowed in the bar due to past altercations. As a result, Mr. Medeiros warned Ms. O'Neill that he was going to "come back and shut the place down."

Thereafter, the defendant went to Mulhearns Pub. He was there for about an hour. The defendant told the bartender, Christina Zigas, that he had been at the EPYC earlier. The defendant ordered two beers. He finished one. About half way into the second beer he was asked to leave because he was harassing other customers. Again, he complained about getting kicked out.

At about 9:20 p.m., the defendant walked into the EPYC. He put on a ski mask, but it was crooked so that much of his face was visible. Furthermore, he was wearing the same clothes he wore earlier in the evening. The defendant pulled out his shotgun, walked up to the bartender, Helena O'Neill, and said "Helen, give me the money." O'Neill, the bartender, immediately recognized the defendant. She said "What the F--, Papa Joe." The defendant went by the nickname "Papa Joe." Defendant said, "I told you I'd be back" Ms. O'Neill hit the panic button, and ran to the back deck where one of the patrons called 911. The transcript of this 911 call is attached hereto as Exhibit 1. Another patron ran around the establishment and saw the defendant, holding a shot gun, get into a white Buick Riviera. The defendant did not get any money as a result of this robbery attempt.

About 10-15 minutes later, at approximately 9:35 p.m., defendant walked through the door at Mulhearns Pub. He was seen by Christina Zigas, the bartender. Ms. Zigas saw the defendant put on the ski mask. Defendant walked up to Zigas and said "this is a robbery, give me the money." Ms. Zigas asked, "are you kidding?" The defendant then said something to the

effect of, "do you think I'm kidding." Defendant then pointed his gun at the head of a patron who was sitting at the bar. The patron told Ms. Zigas that this was a real gun. Defendant said it was loaded. Ms. Zigas took out approximately $100 from the cash register and gave it to the defendant. He then left. Ms. Zigas pressed the panic button and then called 911. The transcript of this 911 call is attached hereto as Exhibit 2.

About one hour later, detectives of the East Providence Police Department caught up with the defendant outside his step-daughter's house on Evergreen Drive in East Providence. Defendant was inside the white Buick Riviera he was driving earlier in the evening. When the police approached, the defendant was combative and refused to obey commands to get on the ground. Inside the white Buick, police seized a shotgun, shotgun shells, another pistol, a starter gun, ski mask, and over $100. Two budweiser bottles were also seized from the car. The defendant appeared somewhat intoxicated at the time of his arrest. At a show-up with both Ms. O'Neill and Ms. Zigas, they both identified the defendant as the individual who robbed them.

According to the business records of the East Providence Yacht Club, the establishment purchases merchandise and supplies from out-of-state vendors, and accordingly conduct interstate commerce.

The firearm seized from Mr. Medeiros was a a Savage Arms, Model 94, 12 gauge shotgun, serial number R026919, with a barrel length of less than 18 inches and an overall length of less than 26 inches. According to the ATF this firearm was manufactured outside the state of Rhode Island, and accordingly traveled in interstate commerce. Further, this firearm is not registered to the defendant in the National Firearms Registration and Transfer Record.

The defendant was previously convicted of Second Degree Murder in Providence

Superior Court on May 20, 1975, and sentenced to serve 15 years at the ACI.

III. Travel of Case

Defendant appeared before Magistrate Judge Lincoln D. Almond for his initial appearance on December 20, 2004. At that time, Assistant Federal Defender Kevin Fitzgerald was appointed to represent the defendant. On January 14, 2004, Mr. Fitzgerald moved to withdraw, which motion was granted. Attorney James McCormick entered his appearance shortly thereafter. On February 22, 2005, defendant moved for psychiatric examination pursuant to 18 U.S.C. §§ 4241(a) & 4242 to determine his competency to stand trial and to evaluate his mental state at the time of the criminal conduct. The government did not object. On March 2, 2005, Magistrate Judge Almond granted defendant's motion. Defendant was evaluated at the Federal Medical Center in Fort Devens, MA from March 23, to May 6, 2005. The defendant was diagnosed with a major depressive disorder in partial remission, alcohol dependence, and antisocial personality disorder. Nonetheless he was found to be competent to stand trial. The Forensic Report also indicates that, while the defendant appears to have been intoxicated at the time of the offense, as a result of his voluntary consumption of alcohol and cocaine, he did not suffer from a severe mental disease of defect that rendered him unable to appreciate the nature and quality, or wrongfulness of his acts. On June 6, 2005, a hearing was held before Magistrate Judge Almond in which he adopted the Forensic Report and denied defendant's motion for further evaluation. On August 9, 2005, defendant appeared before Magistrate Judge Almond for arraignment on an Information and waiver of Indictment.

III. Applicable Law

The defendant wishes to enter a plea of guilty to the Information. Defendant is aware that if he were to proceed to trial, he faces a potential mandatory minimum sentence of 35 years because he could be charged with an additional count of Hobbs Act Robbery and a second 18 U.S.C. § 924(c) count. Accordingly, the defendant stands to gain a substantial benefit by pleading guilty. While the defendant appears to recognize that the evidence against him is overwhelming, he has difficulty admitting the facts of the robberies because, he claims, he was severely intoxicated on the night of the robberies. While the government is not convinced that the defendant was intoxicated to the degree which he claims, there is evidence that the defendant consumed alcohol on the night of his arrest and was at least somewhat intoxicated. Defendant's situation is unique and places him in a difficult position: if he were to go to trial, he runs a very great likelihood of losing and facing a substantially longer term of incarceration. Accordingly, defendant's desire to plead guilty, which is knowing and voluntary, is understandable in light of the totality of circumstances.

Voluntary intoxication is not available as a defense to the robbery count and the 924(c) count. This is because both robbery and the use of a firearm during and in relation to a crime of violence are general intent crimes. See, e.g., United States v. Sewell, 252 F.3d 647, 650 (2nd Cir. 2001) (voluntary intoxication not a defense to bank robbery charge); United States v. Burdeau, 168 F.3d 352, 356 (9th Cir. 1999) (a defense of voluntary intoxication is not available for robbery in special maritime or territorial jurisdiction which is a general intent crime); United States v. Dare, 425 F.3d 634, 641 & FN3 (9th Cir. 2005) (voluntary intoxication is not a defense to 924(c) charge). Furthermore, defendant's "voluntary use of alcohol or drugs, even if they

render the defendant unable to appreciate the nature and quality of his acts, do not constitute insanity or any other species of legally valid affirmative defense." United States v. Garcia, 94 F.3d 57, 61-62 (2nd Cir. 1996). Accordingly, defendant's alcohol and drug consumption on the night of the robberies of the EPYC and Mulhearn's Pub would not be admissible at trial and are not the basis of an affirmative defense.

Federal Rule of Criminal Procedure 11(b) allows the court to accept a plea of nolo contendere from the defendant. Alternatively, the defendant may enter a version of an Alford plea. Indeed, unlike the defendant in North Carolina v. Alford, 91 S.Ct. 160 (1970), this defendant does not assert his innocence, he simply asserts that he cannot recall the events underlying the offense. The Supreme Court in Alford declared that "while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty." Id. at 167. This Circuit has previously approved the use of Alford pleas in certain circumstances. See, e.g., United States v. Bierd, 217 F.3d 15 (1st Cir. 2000), United States v. Kobrosky, 711 F.2d 449 (1st Cir. 1983).

IV. Conclusion

While defendant should be able to admit to his being a felon in possession of a firearm and his possession of an unregistered short barreled shotgun, the defendant should also be allowed to enter a plea of nolo or an Alford plea to the Hobbs Act Robbery and to the 924(c) charge based on the fact that the government can establish a factual basis for such a plea and the defendant does not deny the conduct with which he is charged.

RESPECTFULLY SUBMITTED,

UNITED STATES OF AMERICA

By its attorneys,

ROBERT CLARK CORRENTE
UNITED STATES ATTORNEY

ADI GOLDSTEIN
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of November, 2005 I caused to be sent via facsimile a true copy of the within Government's Memorandum of Law to:

Richard Corley, Esq.
127 Dorrance Street, 2nd Floor
Providence, RI 02903

**911 CALL - E.P. YACHT CLUB**
**MAY 18, 2004**

| | |
|---|---|
| **UF1:** | **Unidentified female #1** |
| **UF2:** | **Unidentified female #2** |
| **911:** | **911 Operator** |
| **EP:** | **E.P. Police Department dispatcher** |
| **Helen:** | **Bar Patron** |
| **UB:** | **Unidentified Bartender** |

UF1: Shut the door - Kelly shut the door

911: 911 - is your emergency police fire or medical?

911: 911

911: 911

UF1: Hi. We have an emergency at the East Providence Yacht Club. We have a gun, um, a man with a mask and a gun that just came in the door.

911: OK. I'll connect you with E.P. police. Stay on the line.

UF1: Thank you. Thank you.

911: One moment.

EP: East Providence Police and Fire.

UF1: Hi. We're at the East Providence Yacht Club. A man just came in with a mask and a gun. We're all outside on the back bar.

EP: Where is he?

UF1: He's um, I don't know. He he was inside the club, I don't know where he went. We're all hiding in the back.

EP: OK.

UF1: I'm not sure where he went.

EP: He's still in there? Yes. Yes.

UF1: Is he still inside?

(UI) background noise.

UF1: Hold on.

EP: Maam, give me your cell phone number.

UF1: Um, I'm on my husband's. It's 508-725-6555

EP: Alright. Give me a description of him please.

UF1: Um, I (UI) the bartender just ran back in because he had a mask on and a gun in his hand.

EP: Mask on and a gun in his hand.

UF1: Yes.

EP: Any colored clothing?

UF1: Um, what color was he, tall?

UI

UF1: We know who it is?

UF2: Yeah.

UF1: Who is it?

UF2: We just threw him out of the bar.

UF1: We just threw him out of the bar. I'm gonna give you to someone else, hold on. Here.

UF2: Hello?

EP: Yes.

UF2: Hello, um yeah we just the bartender just threw him out of the bar and he's actually barred from here, and he took, his well his name's Papa Joe.

EP: Papa Joe?

UF2: Helen, what's his last name?

Helen: Joe Medeiros.

UF2: Joe Medeiros

EP: Joe Medeiros?

UF2: Yup.

EP: He came in with a mask and a gun and you threw him out of the bar?

UF2: Well, she had thrown him out of the bar just maybe a half an hour ago.

EP: A half an hour ago? About how old is he?

UF2: He's an older gentleman. He's driving a white Riviera.

EP: He's driving a white Riviera.

UF2: Yup. He just came into the bar with a mask on his face and pulled a gun at us.

EP: And he pulled a gun on her?

UF2: He pulled a gun on her in the bar.

EP: In the bar.

UF2: Yup.

EP: Did he drive away with the white Riviera?

UF2: Yes he did but nobody got the plate.

EP: That's alright. Is everybody ok in the building?

UF2: Um, yeah, actually we have dart league going out in on back in the back um.

EP: Yeah

UF2: Our dart leagues going on right now.

EP: Yup

UF2: In the back but everybody's ok. I mean the bartenders really shooken up.

EP: Yeah he left in a white Riviera.

UF2: A white Riviera

EP: His name's Joseph Medeiros, nickname Papa Joe.

UF2: Yeah they call him Papa Joe. He knows that he's barred out of here.

EP: About how old is he, roughly?

UF2: Helen, about how old do you think Papa Joe is?

Helen: Late fifties.

UF2: Late fifties maybe early sixties.

EP: Fifties ,white male.

UF2: White male, um Portugese.

EP: Portugese white male.

UF2: Yup.

EP: White Riviera, and he's already left.

Helen: (UI)

UF2: Now he told her that he was gonna come back.

EP: He was coming back?

UF2: Well when she threw him out of the bar cause he's been barred out of here for a couple of months.

EP: Yup

UF2: And he came in and she said he was really intoxicated

EP: Uh huh

UF2: And he knows he's not supposed to be able to come in here and she told him he had to leave and he started flipping out I guess.

EP: Any idea where he lives?

UF2: Um, Helen do you know where he lives? Any idea roughly, it's Riverside isn't it? Warren Avenue

EP: Warren Avenue

UF2: Yup.

EP: (UI)

UF2: White Riviera yes yup.

EP: (UI)

UF2: I'm sorry?

EP: Where did you say he lived?

UF2: They said over on Warren Ave which really narrows it down I guess huh, ha, ha.

EP: (UI) Warren Avenue, you have no idea where on Warren Avenue, huh?

UF2: No. No.

EP: Yeah. Alright, we're gonna send a patrolman in and um I want the bartender.

UF2: You want to speak with the bartender?

EP: Yes.

UF2: Alright, hold on one minute.

UB: Are they outside? They're outside. Tell him (UI)

UF2: Alright, she said, uh did they have a, ok she's gonna walk outside and talk with the officer now.

EP: OK very good.

UF2: Thank you very much. Ba bye.

**911 CALL - MULHEARN'S PUB**
**MAY 18, 2004**

| | |
|---|---|
| **911:** | **911 Operator** |
| **EP1:** | **E.P. Police Department dispatcher #1** |
| **EP2:** | **E.P. Police Department dispatcher #2** |
| **TZ:** | **Tina Zigas** |
| **UM:** | **Unidentified Male** |

911: 911 is your emergency police, fire or medical?

TZ: Police please

911: 507 North Broadway, Mulhearn's Pub?

TZ: Yes.

911: Stay on the line.

TZ: OK.

EP: East Providence Police Fire Rescue.

TZ: Um, uh I need a police.

EP: Where?

TZ: Uh, Mulhearn's Pub, 507 North Broadway.

EP: What's the problem?

TZ: Um, I just got robbed with a gun.

EP: Really?

TZ: Yeah.

EP: Can you describe the person?

TZ: Well I know the guy. He was just in here. Papa, his name is Papa John.

EP: Joe Medeiros?

TZ: Um, I don't know his real name.

EP: Yeah. Did you see the vehicle?

EP2: Mulhearn's just got robbed by that same Papa John.

EP1: OK. Can I get your name?

TZ: My name is Tina.

EP1: Tina?

T: Yup.

EP1: Your last name Tina?

TZ: Zigas - Z-I-G-A-S

EP1: Z-I-G-A-S

TZ: I'm a little scared.

EP1: OK - you guys got a hold up alarm?

TZ: Um, I pushed it.

EP1: Yeah?

TZ: Yeah and I don't (UI)

EP1: Yeah, OK. Cause we're looking for him too cause he just did another one.

TZ: Oh really?

EP1: Yeah.

TZ: He, um I mean it was kind of bizarre cause he walked in here.

EP1: What type of weapon did he have?

TZ: It was like a small, what what kind of weapon was it?

UM: (UI) - gauge

TZ: Saw sawed off shotgun.

UM: (UI)

EP1: Did you see which way that he went?

TZ: Um, he went out of our back door.

EP1: Alright, he went out the rear door.

TZ: And then I, I locked the door. I didn't want him to come back in.

EP1: Yeah.

TZ: Now the back door is actually open.

EP1: Yeah.

TZ: So he can come in again.

EP1: OK Tina we got a police officer on the way over there. We're searching the area.

TZ: Alright thank you.

EP1: OK.

TZ: Bye bye.